UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN LANDS ALLIANCE, et al.          )
                                         )
            Plaintiffs,                  )
                                         )
     v.                                  )          Civil Action No.   04-00434 (RBW)
                                         )
NORTON, et al.                           )
                                         )
            Defendants.                  )
_____ )

## MEMORANDUM OPINION

Legal action was initially brought by the plaintiffs pursuant to the citizen suit provision of

the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(1)(C) (2000), and the Administrative

Procedures Act ("APA"), 5 U.S.C. § 702 (2000), against the Secretary of the Interior and the

Director of the United States Fish and Wildlife Service ("FWS").  The parties have now reached

a stipulated settlement agreement and are currently before the Court on the Plaintiffs' Motion for

an Award of Attorney's Fees and Costs ("Pls.' Mot.") [D.E. # 60].  The plaintiffs request an

award of fees and costs in the amount of $114,883.18 under section 1540(g)(4) of the ESA.[1]  The

amount requested is challenged by the defendants.  For the reasons explained herein, the

plaintiffs' motion is granted in part and denied in part, and fees and costs are awarded to the

plaintiffs in the amount of $107,722.63.

---

[1] The plaintiffs have also filed a Memorandum in Support of Plaintiffs' Motion for Attorneys' Fees and
Costs ("Pls.' Mem.").  In response, the defendants filed a Memorandum of Points and Authorities in Opposition to
Plaintiffs' Motion for an Award of Attorney Fees and Costs ("Defs.' Mem."), which was followed by the plaintiffs'
Reply Memorandum in Support of Plaintiffs' Motion for Attorneys' Fees and Costs ("Pls.' Reply").

## I. Background

The plaintiffs, the American Lands Alliance, the Center for Native Ecosystems, the Forest Guardians, The Larch Company, and Sinapu, filed the four count Amended Complaint ("Am. Compl.") in this action alleging that the defendants violated both the ESA and the APA when it determined that "listing the Gunnison sage-grouse as 'endangered' under the ESA was 'warranted but precluded,'" Am. Compl. ¶ 1, and in "fail[ing] to carry out their mandatory duty to 'make prompt use' of their authority to issue an 'emergency rule' listing the sage grouse . . . as endangered." Id.

Under the ESA, the Secretary of the Interior and the FWS must "conserve species by 'listing' imperiled species as either 'threatened' or 'endangered' . . . ." Am. Compl. ¶ 28 (citing 16 U.S.C. §§ 1533, 1536, 1538 (2000)). The process of listing a species may begin either through the Secretary's own initiative, or through the submission of a public petition to the Secretary. Id. ¶ 29 (citing 16 U.S.C. § 1533(a), (b)(3)). In considering whether a species should be listed, the FWS must then, based on an analysis of five factors,[2] decide whether to list the species as either threatened or endangered. 16 U.S.C. § 1533(a)(1). In the listing process initiated by public petition, the FWS, "to the maximum extent practicable," must make a determination within a period of 90 days as to whether a listing "may be warranted." 16 U.S.C. § 1533(b)(3)(A). Within 12 months of receipt of the petition, the FWS must also make one of three determinations: (1) that the listing is "warranted," (2) that the listing is "not warranted," or

---

[2]The factors considered in determining whether to list a species as either threatened or endangered are: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1).

(3) that the listing is "warranted, but . . . precluded" by other listing priorities.  16 U.S.C. §

1533(b)(3)(B).  A "warranted but precluded" determination is treated as a "resubmitted" petition

as of the date of the finding, which triggers the same requirements mandated for the processing

of original public petitions.  16 U.S.C. § 1533(b)(3)(C)(i). The FWS may bypass the above

process by complying with the requirements for issuing an emergency listing, which takes effect

immediately upon its publication in the Federal Register.  16 U.S.C. § 1533(b)(7).  The foregoing

represents the basic framework for listing determinations issued by the FWS.

An alternative "internal 'track' for addressing species that may warrant listing" "not

provided for in the ESA" and which brought about the filing of the present action, involves the

FWS deferring a final listing of a species "by placing the species on what is called the 'candidate'

list."  Am. Compl. ¶ 32.  Species placed on this list are "species for which [the] FWS has

sufficient information to issue a proposed rule to list the species, but issuance of the proposed

rule is precluded by other higher listing priorities."  Id.  This candidate list is published

periodically in the Federal Register as the Candidate Notice of Review ("CNOR"), and is itself a

final decision even though no individualized determination as to each species on the list has been

made apart from assigning each species a priority listing number. Id. ¶ 33.

The events leading up to the dispute between the parties in this matter commenced in

January, 2000, when the plaintiffs submitted a petition to the FWS proposing that the Gunnison

sage grouse be listed as endangered.  Id. ¶ 55.  In February, 2000, the FWS responded by

declaring the Gunnison sage grouse a "candidate" species, id. ¶ 58, and declining to issue an

emergency rule listing the bird as threatened or endangered, id. ¶ 55.  The FWS then relied on a

1996 Petition Management Guidance ("PMG") policy to refrain from issuing any rulings on the

petition, since the species had been placed on the candidate list.[3]  The FWS's 90-day window for

issuing a preliminary finding that a listing may be warranted then elapsed, prompting the

plaintiffs to file suit against the defendants on September 29, 2000.  Am. Compl. ¶ 61.  After the

parties filed cross-motions for summary judgment, this Court invalidated the PMG policy and

ordered the FWS to issue its 12-month finding on the January 2000 petition submitted by the

plaintiffs.  See Am. Lands Alliance v. Norton, 242 F. Supp. 2d 1, 19 (D.D.C. 2003).  In

requesting reconsideration of the Court's ruling, the defendants claimed that their December 28,

2000 "Notice of Designation of the Gunnison Sage Grouse as a Candidate Species" was the

"functional equivalent" of a "warranted but precluded" finding, which satisfied both the 90-day

and 12-month statutory mandates of the ESA.  Am. Compl. ¶ 67.  Ruling on the defendants'

motion for reconsideration, this Court vacated its order that the FWS publish findings in the

Federal Register in compliance with the ESA, but upheld its holding that the PMG policy was

invalid.  Am. Lands Alliance v. Norton, 360 F. Supp. 2d 1, 3 (D.D.C. 2003).

      In filing this current action, the plaintiffs alleged that the FWS had continued to avoid its

statutory duties under the ESA by relying on the PMG policy this Court had earlier found

unlawful.  Am. Compl. ¶ 70.  Counts I and II of the amended complaint assert that the FWS's

"warranted but precluded" determination for the Gunnison sage grouse did not satisfy the

requirements of the ESA, and was "arbitrary, capricious, and contrary to law," and therefore in

violation of the APA.  Id. ¶ 73.  In Counts III and IV, the plaintiffs contend that the FWS had

violated the ESA and the APA by failing to issue an emergency rule listing the Gunnison sage

---

[3]According to the plaintiffs, the PMG policy allowed FWS to decline to "issue a 90-day finding, carry out a 12-month review, address the five listing factors, consider the merits of the petition, or otherwise comply with the requirements of the ESA if the petition addresse[d] a species that is already on the candidate list."  Am. Compl. ¶ 54.

grouse as endangered.  Id.  In an attempt to settle this matter, in October, 2004, the defendants

offered "to submit for publication in the Federal Register a draft rule for the Gunnison sage

grouse on or by September 1, 2005," and "[a] final listing rule on or by September 1, 2006."

Pls.' Mem., Exhibit ("Ex.") J (October 19, 2004 letter from Mauricia M.M. Baca, counsel for the

Environmental and Natural Resources Division of the U.S. Department of Justice, to Amy

Atwood, counsel for the plaintiffs).  The plaintiffs responded to the offer on January 5, 2005,

with a counteroffer proposing an emergency rule that would list the Gunnison sage grouse as

either threatened or endangered as a condition of any settlement agreement.  Pls.' Mem., Ex. M

(January 5, 2005 letter from Amy Atwood to Lisa Russell, counsel for the U.S. Department of

Justice) at 3-4.  The plaintiffs explained that an emergency listing was warranted due to the

possibly imminent threat of the West Nile Virus infecting the Gunnison sage grouse population.

Id.  The FWS declined the counteroffer, and both parties began preparing cross-motions for

summary judgment.  Pls.' Mem. at 9.  These motions were submitted to the Court by April 1,

2005.  Id.  However, on May 11, 2005, before this Court could rule on the merits of the parties'

motions, the FWS issued a new CNOR, which apparently prompted the plaintiffs to resume

settlement discussions, id., and on November 14, 2005, a Stipulated Settlement Agreement was

submitted to this Court.  Pls.' Mem., Ex. P ("Settlement Agreement").

The terms of the Settlement Agreement are substantially similar to the terms of the

defendants' first settlement offer.  Specifically, the Settlement Agreement provided that the FWS

would "submit for publication in the Federal Register a proposed listing determination as to the

prudence of listing the Gunnison sage grouse [as either threatened or endangered] pursuant to

Section 4(b)(6)(A) of the ESA, on or by March 31, 2006," and "a final listing determination on

or by March 31, 2007." Settlement Agreement at 3. The terms of the agreement also stated that the plaintiffs were entitled to reasonable attorneys' fees for work performed in connection with Counts I and II of the amended complaint, however, no agreement was reached with regard to attorneys' fees for work performed as to Counts III and IV and the defendants dispute in the Settlement Agreement the plaintiffs' right to fees for work performed in connection with these emergency listing claims since these claims were not part of the settlement agreement. Id. at 4. The parties subsequently attempted to negotiate their attorneys' fees dispute, but were unable to reach an agreement as to work performed with respect to Counts III and IV of the amended complaint. The defendants then presented a final offer of settlement in the amount of $40,000 pursuant to Federal Rule of Procedure 68.[4] Pls.' Mem., Ex. X (Nov. 4, 2005 letter from James Maysonett, counsel for the U.S. Department of Justice, to David Bahr, counsel for the plaintiffs). The plaintiffs disputed the applicability of Rule 68 to citizen suits brought under the ESA, and declined to accept the offer. Pls.' Mem., Ex. W (Nov. 8, 2005 Letter from David Bahr to James Maysonett). Consequently, the plaintiffs filed their motion for attorneys' fees and costs, which is opposed by the defendants.

The parties' submissions address four areas of dispute. First, the defendants challenge any award of attorneys' fees for work performed subsequent to the defendants' settlement offer of October, 2004. Defs.' Mem. at 4-7. They contend that any compensation for work performed after the initial settlement offer would be unreasonable because the terms of the Settlement Agreement were substantially similar to the subsequent October, 2004 offer, thereby rendering

---

[4]Rule 68 provides that a defendant may make an offer of judgment for money or property to a plaintiff. If the offer is not accepted and the final judgment obtained is less favorable than the offer, "the offeree must pay the costs incurred after making the offer." Fed. R. Civ. P. 68.

the additional work unnecessary.  Id. at 5-6.  Second, the defendants contest any award of fees for

work performed as to Counts III and IV of the amended complaint because the plaintiffs'

attorneys should only be awarded fees for issues on which the plaintiffs prevailed, and the

emergency listing claims were not part of the Settlement Agreement.  Id. at 7-13.  Third, the

parties dispute the hourly rate at which each of the plaintiffs' two attorneys should be

compensated.  Id. at 13-15.  Finally, the parties dispute the applicability of the defendants' Rule

68 offer of judgment.  Id. at 15-20.  The plaintiffs argue that making a Rule 68 offer applicable in

this case would frustrate the policy goals underlying the citizen suit provision of the ESA, Pls.'

Mem. at 28-32, while the defendants contend that Rule 68 offers of judgment are allowed in

cases brought under the citizen suit provision of the ESA.  Defs.' Mem. at 17.  Each of these

issues will be discussed in turn.

## II. Standard of Review

The ESA provides that a court may "award costs of litigation (including reasonable

attorney and expert witness fees) to any party, whenever the court determines such award is

appropriate."  16 U.S.C. §1540(g)(4) (2000).  The appropriateness of attorney fee awards in

citizen suit cases brought under the ESA and other "appropriateness" fee-shifting statutes is

measured by whether a party "achiev[ed] some success, even if not major success."  Ruckelshaus

v. Sierra Club, 463 U.S. 680, 688 (1983); see also Sierra Club v. EPA 322 F.3d 718, 727 (D.C.

Cir. 2003) (awarding fees where "[p]etitioners unquestionably received some of the relief they

sought").  Hours expended on unsuccessful claims are not compensable, to the extent that they

are unrelated to the plaintiff's successful claims.  Hensley v. Eckerheart, 461 U.S. 424, 435

(1983); Sierra Club v. EPA, 769 F.2d 796, 801 (D.C. Cir. 1985).

When an award of attorney's fees is appropriate, the proper measure of the fee awarded is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley, 461 U.S. at 433.  This figure, then, is the result of two determinations: (1) the reasonable number of hours expended, and (2) the reasonable hourly rate.  Id.  A reasonable hourly rate determination involves three factors: (1) "the attorneys' billing practices;" (2) "the attorneys' skill, experience, and reputation;" and (3) "the prevailing market rates in the relevant community."  Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C. Cir. 1995). In Laffey v. Northwest Airlines, Inc., 746 F.2d 4 (D.C. Cir. 1984), the District of Columbia Circuit affirmed the District Court's reasonableness assessment for measuring reasonable hourly rates, now commonly known as the "Laffey Matrix."  Id. at 30.  The Laffey Matrix designates what are reasonable hourly rates for attorneys of varying experience, and is adjusted annually based on cost of living increases.  Falica v. Advanced Tenant Servs., Inc., 384 F. Supp. 2d 75, 78 (D.D.C. 2005).  As this Court previously reiterated, "[u]sing this matrix as a guide, the Court must then exercise its discretion to adjust this sum upward or downward to arrive at a final fee award that reflects 'the characteristics of the particular case (and counsel) for which the award is sought.'" Id. (quoting Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354, 361 (D.D.C. 1983)). Additionally, parties "may point to such evidence as an updated version of the Laffey matrix or the [United States] Attorney's Office matrix, or their own survey of prevailing market rates in the community."  Covington, 57 F.3d at 1109.  In calculating the reasonable number of hours expended by the attorneys for the party seeking a fee award, "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary."  Hensley, 461 U.S. at 434.  Not all hours actually spent by the

attorneys is necessarily compensable; rather, the Court should award fees for only those hours reasonably spent.  Id.

### III.  Legal Analysis

A.      Work Performed After the Original Settlement Offer was Rejected

The plaintiffs have included in their claim for attorneys' fees hours billed after they rejected the defendants' initial settlement offer on October 19, 2004.  Pls.' Mem. at 17-18.  The defendants dispute the plaintiffs' right to recover these fees, arguing that the settlement offer that the plaintiffs eventually accepted was nearly identical to the October 19, 2004 offer, and any work performed by the plaintiffs' lawyers after that date was therefore unnecessary.  Defs.' Mem. at 4-7.

As previously stated, section 16(g) of the ESA authorizes this Court to "award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate," 16 U.S.C. §1540(g)(4).  This is true irrespective of the fact that the litigation ended through settlement between the parties.  Sierra Club, 322 F.3d at 719.  Under the "catalyst" theory of recovery as construed in Sierra Club, recovery of fees under such a "whenever . . . appropriate" statute is justified when the plaintiffs' claims, though not resulting in a final judgment or court order, are the "catalyst" for the defendants' subsequent remedial actions, which occurs when "parties . . . obtain through settlement or otherwise, substantial relief prior to adjudication on the merits."[5]  Id.  In Sierra Club, a case involving

---

[5]The Court in Sierra Club applied the three-prong test discussed by Justice Ginsburg in her dissent in Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 627-28 (2001) (Ginsburg, J., dissenting), which Judge Tatel noted the majority in Buckannon "express[ed] no disagreement with" and also stated "that it did 'not doubt the ability of district courts to perform the nuanced 'three thresholds' test'" in assessing the catalyst theory's applicability.  Sierra Club, 322 F.3d at 726-27 (quoting Buckannon, 532 U.S. at 610).

(continued . . .)

circumstances very similar to what occurred in this case, the petitioners prevailed on their claim

for attorney's fees following a settlement with the Environmental Protection Agency ("EPA").

Id.  The Sierra Club Court ruled that awarding fees was "appropriate" there because the

"[p]etitioners unquestionably achieved some of the relief they sought."  Id. at 727.  Specifically,

the plaintiffs had filed an action alleging that an EPA rule extending interim stationary air

pollution source operating permits was contrary to law.  Id. at 719-20.   The parties reached a

settlement agreement that required the EPA to cease granting interim approval extensions for

permits and to remove the language from the EPA regulation that allowed the agency to grant

such approvals.  Id. at 720.  The EPA argued that since no court-awarded relief was granted, an

attorney fee award under the citizen suit provision of the Clean Air Act was inappropriate.  Id.

However, the District of Columbia Circuit held otherwise, finding that since the settlement

provided the petitioners "'some of the benefit sought,'" id. at 727 (quoting Buckhannon, 532

U.S. at 627), and that satisfaction of the two other threshold factors considered in Buckhannon

having been met, an award of attorneys' fees was permitted.  Id. at 728.  Here, like the plaintiffs

in Sierra Club, the plaintiffs have achieved "some of the relief they sought," and are thus entitled

to reasonable attorney's fees for hours expended obtaining that relief.  Id.

    A district court has discretion to limit an award of attorneys' fees when a substantial

settlement offer is rejected and subsequent hours litigating the matter are expended.  Moriarty v.

Svec, 233 F.3d 955, 967 (7th Cir. 2000) ("Substantial settlement offers should be considered by

---

(. . . continued)
The three prongs are "whether the claim was colorable rather than groundless; whether the lawsuit was a substantial
rather than an insubstantial cause of the defendant's change in conduct; [and] whether the defendant's change in
conduct was motivated by the plaintiff's threat of victory rather than threat of expense."  Buckannon, 532 U.S. at
610.  As the Sierra Club Court pointed out, the majority in Buckannon did not disagree with this formulation, it
merely disagreed with its application to a "prevailing party" fee-shifting statute.  Id.; Sierra Club, 322 F.3d at 727.

the district court as a factor in determining an award of reasonable attorneys' fees, even where

Rule 68 does not apply.").[6]  This is especially true if the settlement offer is rejected in bad faith.

See Pub. Interest Research Group of N.J., Inc. v. Widnall, No. 90-CV-2138, 1995 WL 836144, at

*5 (D.N.J. Nov. 13, 1995).  In Widnall, after the court granted the plaintiffs' motion for summary

judgment with respect to liability under the Clean Air Act, the defendants disputed the plaintiffs'

right to recover attorneys' fees for hours billed after completion of the settlement conference.  Id.

The defendants claimed the hours were unnecessary, as they resulted in no significant increase in

the relief awarded.  Id.  The court declined to even engage in an analysis of the measure of relief

offered versus that which was later granted, concluding that absent bad faith a party must be free

to continue the litigation.  Id.  The court stated that it "could not penalize an attorney for a

client's decision to reject a settlement offer unless the rejection was motivated by bad faith or

vexatious, wanton, or oppressive reasons."  Id.

    In this case, it appears that the plaintiffs had justification for rejecting the proposed

settlement in October of 2004, and then accepting what appeared to be a substantially similar

offer in 2005.  When the parties were unable to negotiate an agreement with respect to an

emergency listing for the Gunnison sage grouse in late 2004, the plaintiffs, believing that the

West Nile Virus would pose a legitimate threat to the birds during the upcoming summer,

determined that advancing their claims in a motion for summary judgment was the most prudent

course of action.  See Pls.' Mem., Ex. O (Declaration of Mark Salvo) ¶ 16; Ex. W (Nov. 8, 2005

letter from Amy Atwood to James Maysonett) at 4.  It was not until the summer of 2005, when

---

[6]An offer has been considered substantial if "the offered amount appears to be roughly equal to or more than the total damages recovered by the prevailing party."  Moriarty, 233 F.3d at 967.

the immediate threat of the West Nile Virus for the year had passed, that the plaintiffs

reevaluated their strategy.  Pls.' Mem., Ex. W (Nov. 8, 2005 letter from Amy Atwood to James

Maysonett) at 4.  At that point, the plaintiffs determined that the defendants' offer to publish a

proposed rule for listing the Gunnison sage grouse, prior to the summer of 2006 and another

threat of West Nile Virus, would afford the sage grouse the best opportunity for survival.  Id.

The plaintiffs therefore resumed settlement discussions with the defendants and, hopeful that the

Settlement Agreement's proposed rule would take effect prior to the following summer, did not

push for an emergency rule.  See Settlement Agreement.

        Although the defendants argue vehemently against the plaintiffs' claim for attorneys' fees

for the time period after the initial settlement offer was rejected, they have not cited a single case

in support of their position that the plaintiffs should not be compensated for the work they

continued to perform after the rejection.  This Court's independent research similarly has failed

to unearth analogous case law supporting the defendants' position.  Indeed, there appear to be

few circumstances in which it has been deemed appropriate to reduce an award of attorneys' fees

or costs for work performed on a case subsequent to a settlement offer. One such circumstance is

if the proposed settlement offer was properly made as a Rule 68 offer of judgment.  Marek v.

Chesney, 473 U.S. 1, 5 (1985).  In such situations, a party who rejects a valid Rule 68 offer is

barred from recovering attorneys' fees or costs for subsequent work if the eventual recovery is

less than the settlement offer.  Id.; Fed. R. Civ. P. 68.  That situation is not applicable here

because, as this Court ultimately determines later in this opinion, the plaintiffs are entitled to

attorneys' fees and costs far in excess of the defendants' $40,000 offer of judgment.  Another

circumstance in which it is appropriate to reduce an award of fees is when the plaintiff rejects a

settlement offer in bad faith.  <u>Widnall</u>, 1995 WL 836144 at *5.  Here, the plaintiffs did not act in

bad faith in rejecting the defendants' first offer of settlement.  In reviewing the record, it appears

that the plaintiffs had justifiable reasons for rejecting that offer.  <u>See</u> Pls.' Mem., Ex. O

(Declaration of Mark Salvo) ¶ 16 (reiterating their goal of protecting the Gunnison sage grouse).

Although their strategy for protecting the Gunnison sage grouse shifted after the vulnerable

period for West Nile Virus infection in 2005 had passed, it is apparent that the FWS's non-

compliance with the law was the driving force behind the plaintiffs' decisions to press for more

protection for the Gunnison sage grouse.  Moreover, limitations on attorneys' fee awards are

intended to "adequately protect against the possibility that [a fee award statute] might produce a

'windfall' . . . ."  <u>City of Riverside v. Rivera</u>, 477 U.S. 561, 581 (1986) (addressing attorneys fee

awards in civil rights cases).  While awarding the plaintiffs' attorneys' fees for work performed

after the settlement offer will obviously result in greater compensation, the reasons documented

by the plaintiffs for the need to conduct that work convinces this Court that the plaintiffs' goal

was not to obtain a "windfall" through an award of additional attorneys' fees, but rather for the

sole purpose of protecting the Gunnison sage grouse.  Thus, the plaintiffs will not be denied

compensation for hours billed after the defendants' initial settlement offer was submitted.

B.      The Plaintiffs' Request to Obtain Attorneys' Fees for Work Performed on Counts
        III and IV

The plaintiffs request an award of attorneys' fees for all work performed in the case,

including the time expended working on the emergency listing claims.  Pls.' Mem. at 13-17.  As

to these claims, the plaintiffs were seeking a determination that the defendants acted contrary to

law by refusing to use their power under the ESA to circumvent the listing process and issue an

emergency rule immediately listing the Gunnison sage grouse as threatened or endangered.  Am. Compl. ¶¶ 101-02, 105-06.  Nonetheless, the defendants contend that the attorneys' fees and costs generated in pursuing these claims should not be awarded because the settlement agreement did not include any concessions on their part with respect to the emergency listing claims, and therefore the plaintiffs did not prevail on them.  Defs.' Mem. at 7-8.

In <u>Hensley</u>, the Supreme Court held that when a plaintiff "achieve[s] only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."  461 U.S. at 440.  In other words, if a plaintiff is only partially successful, "a reduced fee award is appropriate if the relief . . . is limited in comparison to the scope of the litigation as a whole."  <u>Id</u>.  As the plaintiffs note, however, <u>Hensley</u> is not entirely dispositive in this case.  Pls.' Mem. at 15-17.  In <u>Hensley</u>, the statute at issue was 42 U.S.C. § 1988, which grants attorney's fees to <u>prevailing</u> parties in civil rights cases.  Here, the applicable statute is the Endangered Species Act, specifically, 16 U.S.C. § 5140(g)(4), which provides that a court may award fees "to any party, whenever the court determines such award is appropriate."  As the Supreme Court noted in <u>Ruckelshaus</u>, Congress intended this latter standard to be less exacting than the "prevailing party" standard of civil rights cases.  463 U.S. at 690-91.  Indeed, the <u>Ruckelshaus</u> Court stated, "appropriateness" language, when substituted for "prevailing party" language, is "meant to expand the class of parties eligible for fee awards from prevailing parties to <u>partially prevailing</u> parties – parties achieving <u>some success</u>, even if not major success."  <u>Id.</u> at 688 (emphasis in original).  "To decide that a party is eligible for <u>some</u> fees, however, is not necessarily to determine that it is eligible for fees on <u>all</u> claims it made before the court," or that it is the prevailing party.  <u>Sierra Club</u>, 769 F.2d at 801 (emphasis in original).  Although the

14

"appropriateness" standard announced in Ruckelshaus is more generous than Hensley's

"prevailing party" standard, the propriety of awarding the full measure of attorney's fees

requested still hinges on whether the plaintiffs have lost on "issues unrelated to the successful

claims." Sierra Club, 769 F.2d at 802.  Thus, a court "must be extremely reluctant to award fees

for time expended on those unsuccessfully raised issues."  Id.

    In determining whether successfully raised claims are truly unrelated to unsuccessful

claims, a court is "called upon to make an issue-by-issue assessment" of the plaintiffs' claims.

Kennecott Corp. v. EPA, 804 F.2d 763, 765 (D.C. Cir. 1986).  Moreover, the mere fact that all

the issues in a case stem "from the same set of regulations and the same administrative record"

does not mean that the issues are related enough for a partially successful plaintiff to be awarded

attorney's fees for work performed on both successful and unsuccessful claims.  Sierra Club, 769

F.2d at 803.  A second inquiry that must be undertaken when partial success was achieved

"requires [the court] to ask . . . whether the success obtained . . . is proportional to the effort

reasonably expended on the case."  Id. at 802.  As a general matter, "[p]artial or limited success"

should not result in a full award, as such an award should be reserved for "excellent results."  Id.

    In Sierra Club, the plaintiffs challenged the legality of two regulations governing the

permissible height of smokestacks.  Id.  The plaintiffs presented a number of issues, and prevailed

on eight out of eleven claims.  Id. at 807.  The District of Columbia Circuit declined to award

fees for work performed on the unsuccessful issues.  Id. at 808.  Sierra Club, however, is

distinguishable from the present case.  There, although all the issues raised evolved "from the

same set of regulations and administrative record," the issues were also factually and legally

distinct, and "[e]ach issue involve[d] a particular substantive concern of the petitioners with a

15

particular aspect of [the] EPA's regulations." Id. at 803.  Moreover, in Sierra Club, "the different

policy rationales and statutory provisions set forth by the agency as its support for its decisions

on different issues ma[de] the different claims legally distinct," id., thus requiring distinct factual

and legal research on each issue.  In this case, no such distinction exists.  The plaintiffs have

pursued a consistent objective: requiring the FWS to act in accordance with the plaintiffs'

interpretation of applicable law and determine expeditiously in response to their petition that the

Gunnison sage grouse is "endangered."  Am. Compl. ¶ 1; Pls.' Mem. at 14.  And according to the

plaintiffs, a timely listing determination of the Gunnison sage grouse had not occurred due to the

defendants' "continued reliance on and application of defendant Fish and Wildlife Service's . . .

Petition Management Guidance . . . policy," and their "failure to carry out their mandatory duty

to 'make prompt use' of their authority to issue an 'emergency rule' . . . ."  Am. Compl. ¶ 1.  The

fact that one of the plaintiffs' claims could have achieved that result sooner than the other does

not make the claims unrelated.[7]

Even if, as the defendants argue, the plaintiffs were only successful on two of their claims

and the other two claims were sufficiently unrelated so as to make denial of the costs and fees

associated with those claims appropriate, the defendants have chosen an inappropriate method for

reducing the plaintiffs' claim for those fees and costs.  See Defs.' Mem. at 13.  The defendants

suggest using a simple negative multiplier, whereby the fee award is reduced by the percentage of

successful claims.  Id.  However, this method was flatly rejected by the Supreme Court in

Hensley, 461 U.S. at 435 n.11; see also Public Interest Group of N.J. v. Windall, 51 F.3d 1179,

---

[7]Although an emergency listing would be made through a separate statutory provision than a proposed
listing, see 16 U.S.C. § 1533(b), the end result is the same in both instances: the species is listed as either
"threatened" or "endangered."  Id.

1189-90 (3d Cir. 1995) (describing the "arbitrary results of setting up a proportion based on a rough count of remedies").  A more nuanced approach is necessary to "achieve the twin requirements of a fair fee award, excluding unreasonable time charges and conversely providing compensation for time reasonably spent on the case as a whole."  <u>Windall</u>, 51 F.3d at 1190.  The plaintiffs in this case did not achieve their goal of an emergency listing for the Gunnison sage grouse, but they did however succeed in obtaining the ultimate relief requested – that the FWS make a listing determination in compliance with the ESA.  Settlement Agreement ¶ 1.  Taking into account both the relatedness of the remedies sought, as well as the time "reasonably spent on the case as a whole," the plaintiffs' work on the emergency listing claims was neither unreasonable nor unrelated to the relief obtained.  Accordingly, the plaintiffs will be compensated for the work performed with respect to Counts III and IV.

> C.    The Appropriate Hourly Rate

Also disputed is the appropriate hourly rate at which each of the plaintiffs' attorneys should be compensated.  It is undisputed that the plaintiffs are entitled to at least some attorneys' fees.  The plaintiffs contend that their attorneys are entitled to an hourly rate above the United States Attorney's Office Laffey Matrix but below an adjusted "Legal Services" Laffey Matrix.  Pls.' Mem. at 23.  The defendants dispute the applicability of the Legal Services Laffey Matrix and argue that the plaintiffs' attorneys should receive only the more widely-accepted Laffey Matrix rates.  Defs.' Mem. at 14-15.

Once it is established that a party is entitled to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.'"  <u>Hensley</u>, 461 U.S. at 433.  And, the reasonableness of the fee award is assessed by determining "the number of hours reasonably expended on the

litigation multiplied by a reasonable hourly rate." Id.  The calculation of the first prong of this

formula – the number of hours reasonably expended – was largely the subject of the two prior

sections of this opinion.  The defendants have disputed the reasonableness of certain work

performed by the plaintiffs' counsel, see infra Parts III.A-B, but this Court has determined that

these hours were reasonably expended.  Aside from the work performed on the tasks described

above, the defendants do not dispute the plaintiffs' calculation of the hours expended.

Additionally, this Court is satisfied that the plaintiffs' counsel has not only prepared accurate

timekeeping records, Pls.' Mem., Ex. Y (Plaintiffs' counsel's itemization of their fees and costs),

Ex. HH (Plaintiffs' counsel's updated itemization of their fees and costs), but has adequately

"ma[de] a good faith effort to exclude from [their] fee request hours that [were] excessive,

redundant, or otherwise unnecessary."  Hensley, 461 U.S. at 434; see Pls.' Reply at 10 (referring

to the plaintiffs' exercise of "aggressive billing judgment"); Pls.' Mem., Exs. Y & HH

(documentation of reduced request for the plaintiffs' compensable hours).

The District of Columbia Circuit has concluded that the second prong of the equation for

calculating a fee award – the reasonableness of hourly rates awarded under fee-shifting statutes –

consists of "at least three elements: the attorneys' billing practices; the attorneys' skill,

experience, and reputation; and the prevailing market rates in the relevant community."

Covington, 57 F.3d at 1107.  The first element is difficult to measure in this case, as is generally

the case in other citizen suit cases, because the plaintiffs' attorneys do not have private clients or

employ traditional billing practices.  Pls.' Mem., Ex. N ¶ 9 (Declaration of Amy Atwood in

Support of Pls.' Mot.).  As noted by another member of this Court, "the second and third

Covington elements are, to some degree, intertwined."  Salazar v. District of Columbia, 123 F.

18

Supp. 2d 8, 12 (D.D.C. 2000).  Thus, "[i]n setting the market rate the district court should

consider what rate would be commensurate with the attorneys' skill and experience, and with the

quality of the attorneys' work.."  Id.  Here, the plaintiffs seek compensation for their two

attorneys at a rate above the standard Laffey Matrix published by the United States Attorney's

Office for the District of Columbia.  The rate sought by the plaintiffs is based on a combination

of the United States Attorney's Laffey rate and a rate based on an updated Laffey Matrix which

takes into account the legal services component of the Consumer Price Index.  Pls.' Mem. at 23-

24.  This updated "Legal Services Laffey Matrix" has been used by other judges of this Court,

see, e.g., Salazar, 123 F. Supp. 2d at 14-15, and courts in other federal circuits, see Pls.' Mem. at

23-34 (citing Interfaith Community Org. v. Honeywell, 336 F. Supp. 2d 370, 388 (D.N.J. 2004),

rev'd on other grounds, 426 F.3d 694, 710 (3d Cir. 2005); N.C. Alliance for Trans. Reform v.

N.C. Dep't of Trans., 168 F. Supp. 2d 569, 579-80 (M.D.N.C. 2001)).

    As the plaintiffs note, the Court in Salazar chose to use the Legal Services Laffey Matrix

to compute attorneys' fees there based on the testimony of an expert witness presented by the

plaintiffs, who stated that the Legal Services Matrix most accurately captured the prevailing rates

for legal services.  Salazar, 123 F. Supp. 2d at 15.  Absent any "reasoned, or expert rebuttal" to

that testimony, the Court in Salazar chose to apply the Legal Services Matrix.  Id.  As further

support for awarding the attorneys the higher rate of payment, the Court praised the  plaintiffs'

attorneys' work, stating that they were "extraordinarily conscientious, tenacious, and dedicated

lawyers, with a full grasp of the extremely complex technical issues."  Id. at 12.

    While the Court in Salazar did not ultimately base its decision solely on the complexity of

the case, id. at 14-15, in at least one case, another member of this Court declined to increase

attorney fee awards from the standard Laffey Matrix rates due to the relative simplicity of the

litigation.  Muldrow v. Re-Direct, Inc., 397 F. Supp. 2d 1, 4 (D.D.C. 2005).  In Muldrow, without

"question[ing] that the skill, experience, and reputation of plaintiff's attorneys [was] of the

highest caliber," the Court found that the "plaintiff's attorneys [did] not successfully

demonstrate[] 'the complexity of the case they handled' as required under Covington."  Id.

(quoting Covington, 57 F.3d at 1108).  As the Court in Muldrow explained, "Salazar concerned a

class action which proceeded on three tracks simultaneously" and required considerable

oversight and action on the part of the attorneys involved, whereas the facts in Muldrow

amounted to "a relatively straightforward negligence suit."  Id.

       While the facts in this case do amount to more than a simple negligence suit, they do not

rise to the complexity that existed in Salazar.  Here, the plaintiffs' attorneys had to review the

administrative record, draft their complaint, research the legal issues pertinent to this litigation,

draft their motion for summary judgment, and engage in settlement discussions with the

defendants.  Although this was no small feat, and the plaintiffs have shown that their attorneys

have a great deal of experience litigating cases similar to this one, see Pls.' Mem., Ex. N

(Declaration of Amy Atwood), Ex. BB (Declaration of David Bahr), absent the heightened

complexity that existed in Salazar, the plaintiffs have not convinced this Court that it should stray

from the standard Laffey Matrix.  Indeed, the defendants cite to numerous cases in which

members of this Court have endorsed the standard Laffey Matrix.  See, e.g., Defs.' Mem. at 14-

15 (citing Herbin v. District of Columbia, No. 02-CV-1185, 2006 WL 890673, at *4 (D.D.C.

Apr. 4, 2006) (endorsing the use of the Laffey Matrix); Pleasants v. Ridge, 424 F. Supp. 2d 67,

71 n.2 (D.D.C. 2006) (referring to the Laffey Matrix as "the benchmark for reasonable fees in

this Court"); <u>Northwest Coalition for Alternatives to Pesticides v. EPA</u>, 421 F. Supp. 2d 123, 129

(D.D.C. 2006) (endorsing the Laffey Matrix); <u>Cobell v. Norton</u>, 407 F. Supp. 2d 140, 170

(D.D.C. 2005) (awarding fees based on the Laffey Matrix); <u>District of Columbia v. R.R.</u>, 390 F.

Supp. 2d 38, 41 (D.D.C. 2005) (reducing a requested fee award to comply with the Laffey

Matrix)).  Because of this history, and the Circuit's approval of the Laffey matrix when properly

adjusted to the year for which compensation is sought, <u>see, e.g.</u>, <u>Covington</u>, 57 F.3d at 1109;

<u>Save our Cumberland Mountains, Inc. v. Hodel</u>, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc),

this Court is reluctant to depart from the standard matrix absent a strong showing that such a

departure is justified by the nature and complexity of the litigation.  The plaintiffs here make no

such justification; they simply argue that the Legal Services Laffey Matrix is a more accurate

representation of the hourly rates of attorneys in the District of Columbia.  Recent cases in this

Court have concluded otherwise.  <u>See, e.g.</u>, <u>Pleasants</u>, 424 F. Supp. 2d at 71 n.2 ("[The Laffey

Matrix] is the "benchmark for reasonable fees in this Court.").  Accordingly, the hourly rates the

Court will award in this case will be the standard <u>Laffey</u> Matrix rates published by the United

States Attorney's Office.

## IV.  Conclusion

The plaintiffs have established that they are entitled to compensation for work performed

by their attorneys on all counts of the Amended Complaint, as well as for the work performed in

connection with preparing their motion for summary judgment.  The plaintiffs have also shown

that the number of hours requested for the work performed by their attorneys is reasonable.

However, the Court concludes that the proper hourly rates of compensation the plaintiffs'

attorneys are entitled to receive are those set out in the updated version of the Laffey Matrix

published by the United States Attorney's Office.  Combining these rates with the reasonable

number of hours expended by the plaintiffs' attorneys on this litigation, the plaintiffs are awarded

$107,722.63 for their attorneys' fees and costs.[8]  Finally, because the plaintiffs are entitled to an

award well in excess of the $40,000 amount offered in settlement by the defendants, their award

could not be limited to the amount of the settlement offer even if, as the defendants argue, their

offer is governed by Rule 68.[9]  Accordingly, the plaintiffs' motion for fees is granted in part and

denied in part.

       SO ORDERED this 30th day of November, 2007.[10]

                                       REGGIE B. WALTON
                                       United States District Judge

---

[8]The Court has arrived at this figure by replacing the hourly rates in the plaintiffs' billing statements with the standard Laffey Matrix rates.  See Pls.' Mem., Ex. Y (plaintiffs' itemization of fees and costs); Ex. HH (plaintiffs' updated itemization of fees and costs).

[9]Because the plaintiffs have clearly established that they are entitled to fees in excess of the $40,000 offered by the defendants, this Court need not reach the issue of whether the defendants' offer is governed by Rule 68.

[10]The Court has already issued an order consistent with this Memorandum Opinion.